**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 24, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KANSAS NATURAL RESOURCE
COALITION,

     Plaintiff - Appellant,

v.

UNITED STATES DEPARTMENT OF
INTERIOR; DAVID BERNHARDT, in his
official capacity as Secretary of the
Department of the Interior; UNITED
STATES FISH AND WILDLIFE
SERVICE; MARGARET EVERSON, in
her official capacity as Principal Deputy
Director of the U.S. Fish and Wildlife
Service,

     Defendants - Appellees.

No. 19-3108

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 6:18-CV-01114-EFM-GEB)**
_____

Jonathan Wood, Pacific Legal Foundation, Arlington, Virginia (Jeffrey W. McCoy and
Caleb R. Trotter, Pacific Legal Foundation, Sacramento, California; and Kenneth Estes,
Lakin, Kansas, with him on the briefs), for Plaintiff - Appellant.

Brian C. Toth, Attorney, Environment and Natural Resources Division, United States
Department of Justice, Washington, D.C. (Jeffrey Bossert Clark, Assistant Attorney
General, Eric Grant, Deputy Assistant Attorney General, Bridget K. McNeil, Attorney,
Environment and Natural Resources Division, United States Department of Justice,
Washington, D.C.; Joan R. Goldfarb and Maria E. Lurie, Of Counsel, Office of the
Solicitor, United States Department of Interior, Washington, D.C., with him on the brief),
for Defendants - Appellees.

_____

Before **BRISCOE**, **LUCERO**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

In this Administrative Procedure Act ("APA") case, plaintiff Kansas Natural Resource Coalition ("KNRC") seeks an order enjoining the United States Department of the Interior ("DOI") to submit its rules to Congress, pursuant to the Congressional Review Act ("CRA"), before those rules "take effect." 5 U.S.C. § 801(a)(1)(A). The district court dismissed for lack of subject matter jurisdiction because the CRA contains a provision prohibiting judicial review of any "omission under this chapter." 5 U.S.C. § 805. We affirm based on KNRC's lack of Article III standing. We further decline to remand the case so that KNRC may amend its complaint because, in any event, the district court is correct that it lacks subject matter jurisdiction.

## I.     BACKGROUND

### *A.  Factual History*

#### 1.  The Congressional Review Act

The CRA, enacted as part of the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 251–53, 110 Stat. 857, 868–74 (codified as amended at 5 U.S.C. §§ 801–08), provides:

> Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—(i) a copy of the rule; (ii) a concise general statement

2

relating to the rule, including whether it is a major rule; and (iii) the proposed effective date of the rule.

5 U.S.C. § 801(a)(1)(A).

The CRA contemplates that, with respect to any rule, Congress may enact "a joint resolution of disapproval."[1] *Id.* § 801(b)(1). If Congress passes and the President signs such a resolution, the rule "shall not take effect (or continue)." *Id.* Thereafter, the disapproved-of rule

> may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.

*Id.* § 801(b)(2).

The CRA further provides that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." *Id.* § 805. The CRA also includes a severability clause that states: "If any provision of this chapter or the application of any provision of this chapter to any person or circumstance, is held invalid, the application of such provision to other persons or circumstances, and the remainder of this chapter, shall not be affected thereby." *Id.* § 806(b). Moreover, the CRA instructs that if Congress "does not enact a joint resolution of disapproval . . . , no court or agency may infer any intent of the Congress from any action or inaction of the Congress with regard to such rule, related statute, or joint resolution of disapproval." *Id.* § 801(g).

---

[1] Section 802 of the CRA—enacted "as an exercise of the rulemaking power of the Senate and House of Representatives, respectively"—provides for special rules to streamline each chamber's consideration of a joint resolution of disapproval. 5 U.S.C. § 802(g)(1).

During floor debate on the CRA in the House of Representatives, Congressman David M. McIntosh stated as follows:

> As the principal House sponsor of the Congressional Review subtitle, I am very proud that this bill will soon be sent to the President again, and I hope signed by him this time. The House and Senate passed an earlier version of this subtitle as section 3006 of H.R. 2586, which was vetoed by the President last November. Before it becomes law, this bill will have passed the Senate at least four times and passed the House at least twice. In discussions with the Senate and House co-sponsors this past week, we made several changes to the version of this subtitle that both bodies passed on November 9, 1995, and the version that the Senate passed last week. I will be happy to work with Chairman HYDE and Chairman CLINGER on a document that we can insert in the CONGRESSIONAL RECORD *at a later time* to serve as the equivalent of a floor managers' statement. But because this bill will not likely have a conference report or managers' statement prior to passage, I offer the following brief explanation for some of the changes in the subtitle:

142 Cong. Rec. H3005 (daily ed. Mar. 28, 1996) (emphasis added).

On April 18, 1996, almost three weeks after passage of the CRA, Senator Don Nickles entered a joint statement into the Congressional Record on behalf of himself, Senator Harry Reid, and Senator Ted Stevens that was "intended to provide guidance to the agencies, the courts, and other interested parties when interpreting the [CRA's] terms." 142 Cong. Rec. S3683 (daily ed. Apr. 18, 1996).

That joint statement explained the meaning and purpose of § 805, the CRA's judicial review provision, as follows:

> Section 805 provides that a court may not review any congressional or administrative "determination, finding, action, or omission under this chapter." Thus, the major rule determinations made by the Administrator of the Office of Information and Regulatory Affairs of the Office of Management and Budget are not subject to judicial review. Nor may a court review whether Congress complied with the congressional review procedures in this chapter. This latter limitation on the scope of judicial

4

review was drafted in recognition of the constitutional right of each House of Congress to "determine the Rules of its Proceedings," U.S. Const., art. I, § 5, cl. 2, which includes being the final arbiter of compliance with such Rules.

The limitation on a court's review of subsidiary determination or compliance with congressional procedures, however, does not bar a court from giving effect to a resolution of disapproval that was enacted into law. A court with proper jurisdiction may treat the congressional enactment of a joint resolution of disapproval as it would treat the enactment of any other federal law. Thus, a court with proper jurisdiction may review the resolution of disapproval and the law that authorized the disapproved rule to determine whether the issuing agency has the legal authority to issue a substantially different rule. The language of subsection 801(g) is also instructive. Subsection 801(g) prohibits a court or agency from inferring any intent of the Congress only when "Congress does not enact a joint resolution of disapproval," or by implication, when it has not yet done so. In deciding cases or controversies properly before it, a court or agency must give effect to the intent of the Congress when such a resolution is enacted and becomes the law of the land. The limitation on judicial review in no way prohibits a court from determining whether a rule is in effect. For example, the authors expect that a court might recognize that a rule has no legal effect due to the operation of subsections 801(a)(1)(A) or 801(a)(3).

*Id.* at S3686. The next day, Congressman Henry J. Hyde offered for the record in the House of Representatives a statement that included the same two paragraphs quoted above. 142 Cong. Rec. E577 (daily ed. Apr. 19, 1996).

In 2006, the House Judiciary Committee published a report that referred to the Senators' joint statement—in a footnote—as "the most authoritative contemporary understanding of the provisions of the law." Staff of H. Comm. on the Judiciary, Subcomm. on Commercial & Admin. L., 109th Cong., *Interim Rep. on the Admin. Law, Process & Procedure Project for the 21st Century* 86 n.253 (Comm. Print 2006). But the report also referred to the joint statement as "post-enactment legislative history" that

5

"does not carry the weight that committee report explanations and floor debates provide."

*Id.*

### 2. The PECE Rule

The Endangered Species Act requires the Secretary of Interior to "determine whether any species is an endangered species or a threatened species." 16 U.S.C. § 1533(a)(1). In the course of making these required determinations, Congress has instructed the Secretary to take into account "those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas." *Id.* § 1533(b)(1)(A).

On March 28, 2003, DOI—through the United States Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service—announced "a final policy for the evaluation of conservation efforts when making listing decisions" under the Endangered Species Act. Policy for Evaluation of Conservation Efforts When Making Listing Decisions, 68 Fed. Reg. 15,100, 15,100 (Mar. 28, 2003) (the "PECE Rule" or "Rule"). The PECE Rule,[2] issued with an effective date of April 28, 2003, identifies criteria for DOI to "use in determining whether formalized conservation efforts that have yet to be implemented or to show effectiveness contribute to making listing a species as threatened or endangered unnecessary." *Id.*

---

[2] The PECE Rule is a "rule" as defined by the CRA. *See* 5 U.S.C. § 804(3).

Those criteria are: "(1) [t]he certainty that the conservation efforts will be implemented and (2) the certainty that the efforts will be effective." *Id.* at 15,101. The Rule also identifies factors DOI will consider when assessing each of these criteria. *See id.* at 15,114–15.

KNRC alleges that DOI never submitted the PECE Rule to Congress. Nevertheless, FWS treats the Rule as if it is in effect.

### 3. The Lesser prairie-chicken

On December 11, 2012, DOI proposed listing the lesser prairie-chicken as a threatened species under the Endangered Species Act. *See* Listing the Lesser Prairie-Chicken as a Threatened Species, 77 Fed. Reg. 73,826. In response, the Western Association of Fish and Wildlife Agencies implemented a conservation plan that it hoped would avoid the need for a listing.

Despite these efforts, on April 10, 2014, DOI announced it was listing the lesser prairie-chicken as threatened, effective May 12, 2014. *See* Determination of Threatened Status for the Lesser Prairie-Chicken, 79 Fed. Reg. 19,973, 19,974 (the "listing decision"). On September 1, 2015, the United States District Court for the Western District of Texas vacated the listing decision because DOI "failed to properly apply" the PECE Rule. *Permian Basin Petroleum Ass'n v. Dep't of the Interior*, 127 F. Supp. 3d 700, 707 (W.D. Tex. 2015).[3] On July 20, 2016, DOI complied with the district court's

---

[3] In its complaint and in its opening brief, KNRC represents that it "participated" as amicus in the *Permian Basin* litigation. App. at 19; *see also* Appellant Br. at 13. That is not completely accurate. In the *Permian Basin* case, KNRC filed a motion for leave to file an amicus brief in support of plaintiffs' motion

7

ruling and withdrew the listing decision. *See* Lesser Prairie-Chicken Removed From the List of Endangered and Threatened Wildlife, 81 Fed. Reg. 47,047.

On September 8, 2016, several nonprofits petitioned DOI to list the lesser prairie-chicken as endangered. On November 30, 2016, DOI determined that an emergency listing was not warranted, but also initiated a status review because the petition presented "substantial scientific or commercial information indicating that listing the lesser prairie-chicken may be warranted." Endangered and Threatened Wildlife and Plants; 90-Day Findings on Three Petitions, 81 Fed. Reg. 86,315, 86,317.

On June 12, 2019, the petitioner-nonprofits sued DOI in the United States District Court for the District of Columbia for failing to publish a complete finding on whether listing of the lesser prairie-chicken is warranted. Complaint, *Defs. of Wildlife v. Bernhardt*, No. 1:19-cv-01709-RC (D.D.C. June 12, 2019), ECF No. 1. On September 16, 2019, the district court approved a settlement agreement whereby DOI agreed to publish a new 12-month finding on whether listing is warranted no later than May 26, 2021. *See* Stipulated Settlement Agreement, *Defs. of Wildlife* (D.D.C. Sept. 16, 2019), ECF No. 7, at 2.

---

for summary judgment. The district court denied that motion, however, after finding KNRC's amicus brief "unnecessary to adequately evaluate the merits of the case." Order, *Permian Basin Petroleum Ass'n v. Dep't of the Interior*, No. MO-14-CV-050 (W.D. Tex. May 26, 2015), ECF No. 71.

### 4. KNRC's Conservation Plan

KNRC is "an organization of county governments in western Kansas that promotes local government participation in federal and state policy on conservation and natural resource issues." App. at 8. It is funded and governed by member counties.

In 2013, KNRC developed its own conservation plan for the lesser prairie-chicken, which all its member counties adopted. KNRC's plan "calls for counties to develop and implement policies to control invasive species that encroach on lesser prairie-chicken habitat, to promote sustainable grazing, to better mark fences to prevent entanglement or injury, and to encourage habitat restoration." App. at 21.

Because DOI has not submitted the PECE Rule to Congress, KNRC alleges the Rule has no lawful effect. And because the Rule is not legally effective, KNRC and its member counties claim they may not beneficially rely on the Rule in implementing KNRC's lesser prairie-chicken conservation plan. This allegedly puts conservation agreement participants "in a bind: they must show that their plans are certain to be implemented and effective but the failure to submit the PECE Rule undermines the incentives necessary to achieve that certainty." App. at 17–18; *see also* App. at 21–22.

### B. Procedural History

On April 10, 2018, KNRC filed a complaint for declaratory and injunctive relief against DOI, the Secretary of Interior, FWS, and the Principal Deputy Director of FWS in the United States District Court for the District of Kansas. The complaint asserted a single claim for relief under the APA, based on the theory that DOI's ongoing failure to

9

submit the PECE Rule to Congress constitutes "agency action unlawfully withheld or unreasonably delayed." App. at 23 (quoting 5 U.S.C. § 706(1)). KNRC requested:

- "a declaration that submission of the rule under the [CRA] is agency action unlawfully withheld or unreasonably delayed;"
- "a declaration that [DOI] must submit the rule to Congress without delay;"
- "an injunction requiring [DOI] to submit the rule to Congress under the [CRA];" and
- "an award of KNRC's cost of litigation."

App. at 23–24.

DOI moved to dismiss the complaint, asserting that (1) KNRC lacks Article III standing; (2) the limitations period has expired; and (3) 5 U.S.C. § 805 precludes judicial review of DOI's failure to submit the PECE Rule to Congress.

On April 8, 2019, the district court granted DOI's motion based solely on its judicial review argument. Specifically, the district court found the "plain language" of 5 U.S.C. § 805 "prohibits judicial review" of DOI's failure to send the PECE Rule to Congress. App. at 31. It therefore found it "unnecessary to consider the legislative history." App. at 35. In addition, the district court relied on a footnote in our decision in *Via Christi Regional Medical Center, Inc. v. Leavitt*, 509 F.3d 1259, 1271 n.11 (10th Cir. 2007), stating that the CRA "specifically precludes judicial review of an agency's compliance with its terms." *See* App. at 33 & n.30.

The district court entered judgment on April 10, 2019. KNRC timely filed a notice of appeal on May 23, 2019.

10

## II.    DISCUSSION

We begin our analysis by explaining that KNRC has not plausibly alleged Article III standing. In the interest of judicial economy, however, we then proceed to the question of subject matter jurisdiction. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) ("[T]here is no mandatory 'sequencing of jurisdictional issues.'" (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999))). Because we agree with the district court that it lacked subject matter jurisdiction, we decline to remand for the purpose of allowing KNRC to seek leave to amend the complaint to cure the standing defect. Instead, we affirm the district court's order dismissing the complaint.

### A.    *Article III standing.*

The Constitution extends the "judicial Power" only to "Cases" and "Controversies." U.S. Const. art. III, § 2. To establish a case or controversy, a plaintiff must possess standing to sue. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.*

DOI disputes that KNRC has alleged an injury in fact. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). For an injury to be concrete, "it must actually exist." *Id.* "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.*

11

(quoting *Lujan*, 504 U.S. at 560 n.1). And for an injury to be imminent, it "must be 'certainly impending.'" *COPE v. Kan. State Bd. of Educ.*, 821 F.3d 1215, 1222 (10th Cir. 2016) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan*, 504 U.S. at 561. "However, '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *COPE*, 821 F.3d at 1221 (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The complaint alleges that DOI's ongoing violation of the CRA "undermines" KNRC's conservation plan by creating uncertainty. App. at 22. In KNRC's view, this allegation encompasses four possible injuries. First, KNRC claims it is injured because it cannot rely on the PECE Rule until the Rule takes effect, and the Rule cannot take effect until it is submitted to Congress. *See* 5 U.S.C. § 801(a)(1)(A). Second, KNRC asserts injury because it cannot rely on the PECE Rule until the time for a joint resolution of disapproval expires, and the time to consider a joint resolution of disapproval does not start to run until DOI submits the Rule to Congress. *See id.* § 802(b)(1). Third, KNRC argues it will be injured because DOI will soon consider whether to list the lesser prairie-chicken, and the status of the PECE Rule will influence DOI's analysis. And fourth, KNRC contends it will be injured if DOI lists the lesser prairie-chicken without properly applying the PECE Rule. We address these theories in the order presented.

**1. KNRC's First Theory: The Impact of a Rule Not Lawfully in Effect.**

KNRC's first theory of standing is that it cannot rely on the PECE Rule in implementing its conservation plan, because the Rule has not lawfully taken effect. This, in turn, "undermines the incentives for counties and property owners to participate in KNRC's plan." App. at 22. According to KNRC, certainty is "essential" because "preparing a conservation plan requires the commitment of vast resources." App. at 17.

KNRC has not alleged a concrete injury. Based on the complaint, it does not appear that any county or property owner has refused to participate in KNRC's conservation plan, due to uncertainty over the PECE Rule or for any other reason. In fact, KNRC fails to allege that a county or property owner has even expressed concerns over the Rule's validity. This deficiency, coupled with the fact that KNRC specifically alleges its plan has been adopted by "its 32 member counties," App. at 8, means the complaint does not allege any tangible harm KNRC is currently suffering due to DOI's conduct. To the extent KNRC claims injury by the possibility that a court might someday find the PECE Rule invalid under the CRA, such an injury is speculative.

KNRC alleges in general terms that, "to provide the certainty that the conservation efforts called for in the plan will be implemented, participating counties and property owners must have confidence that the PECE Rule is lawfully in effect." App. at 21. But, to reiterate, KNRC does not allege that anyone besides KNRC itself—in this lawsuit— has exhibited any lack of confidence in the Rule. And the complaint describes counties'

13

and property owners' "incentives" without alleging that any of them is having doubts about participating in KNRC's conservation plan. App. at 22.[4]

To overcome these shortcomings in the complaint, KNRC analogizes its situation to that of a petitioner seeking a required response from an agency. *See* Appellant Reply at 21 (citing 5 U.S.C. § 555(e)). Section 555(e) of the APA states that "[p]rompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding." 5 U.S.C. § 555(e). KNRC's analogy falls short because the right to a response under § 555(e) merely facilitates judicial review when a plaintiff otherwise has Article III standing. *See High Country Citizens All. v. Clarke*, 454 F.3d 1177, 1192 (10th Cir. 2006). Section 555(e) does not independently entitle a plaintiff to relief in the absence of "prejudice suffered or damage incurred." *Id.*

Contrary to KNRC's contention, the D.C. Circuit's decision in *Natural Resources Defense Council, Inc. v. Securities & Exchange Commission*, 606 F.2d 1031 (D.C. Cir. 1979), did not alter that Article III standing analysis. There, petitioners had standing to sue for a response to their petition because the SEC's failure to provide "equal employment or environmental information" impaired their ability to vote their shares "in

---

[4] The dissent repeats the complaint's threadbare allegation that "counties and property owners are less likely to undertake the burdensome actions the [conservation plan] requires because the Rule may not actually be in effect." Dissent at 3. This allegation—devoid of specifics—cannot overcome KNRC's failure to plead any instance where anyone expressed any doubt about the status of the Rule outside the confines of this lawsuit, let alone refused to participate in the conservation plan as a result of such doubts. *See COPE v. Kan. State Bd. of Educ.*, 821 F.3d 1215, 1221 (10th Cir. 2016).

a financially prudent and ethically sound manner." *Id.* at 1042. Here, by contrast, KNRC fails to allege a connection between DOI's failure to submit the PECE Rule to Congress and KNRC's legally protected interests.

Nor can KNRC's theory be shoehorned into the body of precedent where courts have found standing to assert procedural rights available at common law or created by Congress. *See Spokeo*, 136 S. Ct. at 1549 (collecting cases). As examples of such procedural rights, the Court in *Spokeo, Inc. v. Robins* cited libel, slander *per se*, and statutes requiring the public release of information. *See id.* at 1549–50. These examples are all instances where a procedural right exists—or was created—to vindicate an individual's concrete interest. The CRA's requirement that agencies submit their rules to Congress, by contrast, seems designed to facilitate Congress's oversight of the executive branch. And even if the CRA's reporting requirement were designed to protect third parties with an interest in agency rules, KNRC would still need to allege an otherwise cognizable concrete injury. *See Strubel v. Comenity Bank*, 842 F.3d 181, 190 (2d Cir. 2016) (explaining that "even where Congress has accorded procedural rights to protect a concrete interest, a plaintiff may fail to demonstrate concrete injury where violation of the procedure at issue presents no material risk of harm to that underlying interest").[5]

---

[5] The dissent cites a number of cases finding concrete injuries based on procedural errors, but none is analogous to the situation here. One involved a financial interest in nuclear waste storage. *See Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1234 (10th Cir. 2004). Another involved "the process under which a state and a tribe negotiate a [gaming] compact." *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1217 (10th Cir. 2017). And the remainder involved environmental harms. *See WildEarth Guardians v. U.S. E.P.A.*, 759 F.3d 1196, 1205 (10th Cir. 2014); *S. Utah Wilderness All. v. Office of Surface Mining Reclamation &*

**2. KNRC's Second Theory: The Pall of a Joint Resolution of Disapproval.**

KNRC's second theory is that it cannot rely on the PECE Rule until the time for a joint resolution of disapproval expires. This theory fails because Congress can overturn the PECE Rule at any time, regardless of the CRA.[6] And it makes no difference to our analysis that Congress has provided for streamlined consideration of a joint resolution through the CRA. KNRC has no legally protected interest in Congress's internal lawmaking procedures, so long as Congress complies with the requirements of bicameralism and presentment. *See Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 562 (9th Cir. 2019) (rejecting a constitutional challenge to a joint resolution of disapproval because Congress passed and the President signed the resolution); 5 U.S.C. § 802(g)(1) (explaining that joint resolutions of disapproval are "an exercise of the rulemaking power of the Senate and House of Representatives").

---

*Enf't*, 620 F.3d 1227, 1234 (10th Cir. 2010); *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002). The common theme in these cases is that, in each, the alleged procedural error plausibly threatened an injury far more concrete than some legal uncertainty that might impact a future rulemaking.

The dissent separately argues that KNRC needs "an opportunity to sway administrative decisionmakers to rule" in its favor by not listing the lesser prairie-chicken. Dissent at 5. But the dissent's only reason that KNRC's potential, future presentation to DOI is currently under threat is uncertainty, which we have already rejected as inadequately pleaded. Moreover, the dissent's support for its "sway" theory is *Carey v. Piphus*, 435 U.S. 247 (1978), a case about school disciplinary hearings, not the APA. *See also Rector v. City & Cty. of Denver*, 348 F.3d 935, 944 (10th Cir. 2003) (discussing *Carey*).

[6] Contrary to the dissent's assertion, we do not hold that KNRC may not rely on the Rule because Congress might overturn it. Rather, KNRC has no legally protected interest in Congress's use of a joint resolution of disapproval versus some other legislative procedure.

**3.** **KNRC's Third Theory: The Influence of the PECE Rule on DOI's Ongoing Listing Analysis.**

KNRC's third theory is that DOI will soon consider whether and how to apply the PECE Rule to its new listing decision, as contemplated by the stipulated settlement agreement in *Defenders of Wildlife*, No. 1:19-cv-01709-RC (D.D.C. Sept. 16, 2019), ECF No. 7. KNRC suggests there is a risk DOI's analysis "will give short shrift" to KNRC's conservation plan. Appellant Reply at 25.

KNRC's asserted injury is too speculative to satisfy standing. As DOI again considers whether to list the lesser prairie-chicken, it is required by the Endangered Species Act to consider "those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices." 16 U.S.C. § 1533(b)(1)(A). The PECE Rule explains how DOI plans to meet that statutory requirement but does not foreordain any particular outcome. Nor would the absence of the PECE Rule alleviate DOI's statutory obligation to consider KNRC's efforts.

KNRC is not injured by an analysis that has yet to take place. Likewise, it cannot show a certainly impending injury when the outcome of that analysis is unknown. *See Ctr. for Biological Diversity*, 946 F.3d at 560 (holding that a plaintiff lacked standing to challenge a hypothetical future rulemaking for failure to comply with the CRA).

**4. KNRC's Fourth Theory: The Potential for an Unlawful Listing Decision.**

KNRC's fourth theory is that it will "suffer additional injury if the lesser prairie-chicken is listed without proper consideration of KNRC's conservation plan or a decision not to list the species is struck down for considering plans like KNRC's." Appellant Reply at 25. This asserted injury is speculative because it depends on the outcome of a future rulemaking (and subsequent litigation). KNRC may never suffer the asserted injury, so the question is not just *when* it may sue, but if it will *ever* be a proper plaintiff to bring this claim. *Cf. S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1157 (10th Cir. 2013) ("The question here is not *whether* [the plaintiff] is a proper party to challenge [the agency's] decision, but *when* it can do so.").[7]

KNRC asserts that the shortcomings with respect to standing identified in the complaint are "curable," and asks that, rather than remand "with leave to amend," we reach the issue of subject matter jurisdiction "to avoid the needless waste of party and judicial resources." Appellant Reply at 19. We agree this is the proper course. *See Ohlander v. Larson*, 114 F.3d 1531, 1538 (10th Cir. 1997) (declining to remand a case "in the interest of efficiency and judicial economy, and in the interest of providing immediate guidance"). Accordingly, we now consider whether the CRA strips the federal courts of jurisdiction over this matter.

---

[7] The dissent draws a distinction between DOI failing to consider KNRC's plan "at all," versus failing to give the plan "proper consideration." Dissent at 11–12. The import of this distinction eludes us; it only highlights the speculative nature of KNRC's alleged injury, because DOI might ultimately consider KNRC's plan in precisely the fashion KNRC desires.

18

## B. Subject Matter Jurisdiction

"We review de novo whether subject-matter jurisdiction is proper." *Navajo Nation v. Dalley*, 896 F.3d 1196, 1203 (10th Cir. 2018). There is no dispute that the APA confers subject matter jurisdiction over KNRC's claim if 5 U.S.C. § 805 does not preclude it. So, our task is to interpret § 805.

> The goal of statutory interpretation is to ascertain the congressional intent and give effect to the legislative will. In conducting this analysis, we first turn to the statute's plain language. We give undefined terms their ordinary meanings, considering both the specific context in which the word is used and the broader context of the statute as a whole.

*In re Taylor*, 899 F.3d 1126, 1129 (10th Cir. 2018) (internal quotation marks omitted).

### 1. Plain Language

The CRA provides that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. For our purposes, the two key phrases in § 805 are "omission" and "under this chapter." *Id.* The statute does not define either phrase, so we rely on ordinary meaning. *In re Taylor*, 899 F.3d at 1129.

An "omission" is a "failure to do something; esp., a neglect of duty." *Omission*, Black's Law Dictionary (11th ed. 2019). "Under," when used as a preposition, sometimes means "subject to the authority, control, guidance, or instruction of," as in "*under* the terms of the contract." *Under*, Merriam-Webster, http://www.merriam-webster.com/dictionary/under (last visited Mar. 25, 2020). So, an "omission under this chapter" refers to the failure to do something that the CRA requires.

DOI's duty to submit the PECE Rule to Congress arises under § 801(a)(1)(A). KNRC alleges that DOI has failed to do something the CRA requires it to do by not

19

submitting the PECE Rule to Congress. Consequently, KNRC's claim is covered by the plain language of § 805, and we lack subject matter jurisdiction to review DOI's omission.

KNRC resists this conclusion by citing *Kucana v. Holder*, 558 U.S. 233 (2010). In that case, the Supreme Court described the word "under" as "chameleon" because "it 'has many dictionary definitions and must draw its meaning from its context.'" *Id.* at 245 (quoting *Ardestani v. I.N.S.*, 502 U.S. 129, 135 (1991)). There, the Court was interpreting 8 U.S.C. § 1252, which prohibits courts from reviewing any "decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified *under this subchapter* to be in the discretion of the Attorney General or the Secretary of Homeland Security. . . ." 8 U.S.C. § 1252(a)(2)(B)(ii) (emphasis added).

KNRC argues there is no difference between the phrase "under this chapter" in the CRA and the phrase "under this subchapter" as interpreted in *Kucana*. But the context in which the two phrases appear is very different. In 8 U.S.C. § 1252, "under this subchapter" identifies the location of the specified authority. And that authority, the Supreme Court explained in *Kucana*, might be specified in statutes *or* regulations. *See* 558 U.S. at 244. In the CRA, by contrast, "under this chapter" modifies "determination, finding, action, or omission." 5 U.S.C. § 805. And other parts of the CRA expressly contemplate various determinations, findings, actions, or omissions. *See, e.g.*, *id.* § 801(a)(1)(A). So, in this context, the referent of the term "under" is clear. "Under this chapter" refers to duties the CRA imposes on various actors, whether those duties take the form of determinations, findings, actions, or omissions.

20

KNRC also argues it is ambiguous whether § 805 refers to omissions by Congress or omissions by agencies. We disagree. The CRA contemplates determinations, findings, actions, and omissions by agencies, the Comptroller General, the President, and Congress. *See, e.g.*, *id.* § 801(a)(1)(A) (agencies "shall submit" a report); *id.* § 801(a)(1)(C) (the House and Senate "shall provide" copies of the report to committees); *id.* § 801(a)(2)(A) (the Comptroller General "shall provide" a report on each major rule); *id.* § 801(a)(2)(B) (agencies "shall cooperate" with the Comptroller General); *id.* § 801(c)(1) (a rule that would otherwise not take effect may take effect if the President "makes a determination"); *id.* § 808 (if an agency "finds" for good cause that notice and public procedure "are impracticable, unnecessary, or contrary to the public interest," the agency then "determines" when the rule "shall take effect"). There is nothing in the text of the CRA to suggest that § 805 applies only to a subset of these determinations, findings, actions, and omissions, depending on the actor who performs them. Instead, the CRA unambiguously prohibits judicial review of any omission by any of the specified actors.[8]

The dissent embraces a different reading. In the dissent's view, § 805 "strips review of compliance with the CRA's review procedures, which do not arise until after

---

[8] Relying on the canon noscitur a sociis, the dissent reasons that § 805 cannot apply to DOI's omissions because the CRA does not also task DOI with making determinations or findings. Yet the CRA does contemplate agencies making determinations. Specifically, § 808 states that, "[n]otwithstanding section 801," an agency may "determine[]" when a rule takes effect under certain circumstances. In addition, the CRA does not charge *any* one actor with determinations, findings, actions, *and* omissions. The dissent's concern that different terms in § 805 might apply to different actors is therefore inevitable under any reading.

an agency has submitted a proposed rule for review." Dissent at 23. This reading—which excludes agencies' reporting obligations to Congress and to the Comptroller General— has no basis in the text of § 805. The dissent asserts that the CRA requires only determinations and findings after submission of a rule, but it offers no interpretation of the terms "action" or "omission." So, the dissent would have us read § 805 to preclude judicial review of all omissions except those arising under § 801(a)(1)(A). We decline to "add to, remodel, update, or detract from" the CRA's plain language in such a manner. *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020).

## 2. Canons of Statutory Interpretation

Because we hold the plain language of § 805 is clear, we need not rely on the various canons of statutory interpretation. *See Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227, 1232 (10th Cir. 2016). We nevertheless address KNRC's invocation of several canons, to ensure that our interpretation of § 805 is sound.

First, we consider the canon relating to surplusage. KNRC argues our interpretation of § 805 renders meaningless the CRA's prohibition on agencies reissuing a disapproved-of rule "in substantially the same form." 5 U.S.C. § 801(b)(2). In so arguing, KNRC assumes an agency's decision to reissue a disapproved-of rule would constitute a "determination, finding, action, or omission under this chapter." 5 U.S.C. § 805. That assumption is tenuous. As we have already explained, "under this chapter" specifies those determinations, findings, actions, or omissions that are covered by § 805. If an agency were to promulgate a disapproved-of rule, it would presumably do so in reliance on its rulemaking authority. Those rulemaking authorities are not part of the

22

CRA, *i.e.*, "this chapter." It is therefore not obvious that an agency's decision to reissue a disapproved-of rule—pursuant to authority conferred by statutes other than the CRA— would fall within § 805's limited scope.[9]

KNRC also argues our interpretation renders the CRA's severability clause superfluous. To the contrary, the severability clause would apply if a plaintiff with standing claimed that a portion of the CRA violated the separation of powers doctrine, for example, because such a claim would not be covered by § 805. *See Ctr. for Biological Diversity*, 946 F.3d at 560–62 (considering and rejecting such a claim).

Next, KNRC invokes the CRA's purpose, which is purportedly to "restrain[] agency overreach." Appellant Br. at 36. But that broad statement of purpose tells us nothing about whether Congress intended district courts to review agency compliance with the CRA's reporting requirements. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) (instructing courts to assume "the ordinary meaning . . . accurately expresses the legislative purpose").

The dissent analogizes Congress's enactment of § 805 to its contemporaneous repeal of a jurisdiction-stripping provision in the Regulatory Flexibility Act ("RFA"). But, as the dissent acknowledges, the two statutes used very different language. It is undeniable that § 805 constrains judicial review to some extent. Our interpretation of the

---

[9] We do not decide whether a court would have subject matter jurisdiction to review such a hypothetical rule because that question is not before us in this appeal. So, contrary to the dissent's accusation, our opinion today does not render the CRA "ineffectual." Dissent at 23.

23

CRA is therefore just as "harmonious with the RFA" as the dissent's interpretation. Dissent at 25.

### 3. Legislative History

Once we exhaust the traditional tools of statutory interpretation, we may (cautiously) turn to the legislative history. *See Ausmus v. Perdue*, 908 F.3d 1248, 1254 (10th Cir. 2018). The only piece of evidence that speaks directly to § 805 is the Senators' joint statement. *See* 142 Cong. Rec. S3686 (interpreting the CRA to permit judicial review of whether a rule has taken effect). That statement—entered into the Congressional Record after the CRA passed—is "an extremely hazardous basis for inferring the meaning of a congressional enactment." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980). The legislators who voted for or against the CRA did not have that statement before them when they considered the bill. All they had was Congressman McIntosh's promise to insert a statement into the record "at a later time." 142 Cong. Rec. at H3005.[10]

KNRC points to the Supreme Court's observation in *United States v. Woods*, 571 U.S. 31, 48 (2013), that a commentary on a recently passed law, "like a law review article, may be relevant to the extent it is persuasive." Because the Senators' floor statement contradicts the plain language of § 805, however, it is not persuasive.

---

[10] The fact that the promised statement was entered into the Congressional Record soon after the CRA's passage does not mitigate our concerns. "Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011).

## 4. Presumption of Judicial Review

Throughout its brief, KNRC invokes the presumption in favor of judicial review of administrative agency action. "The presumption can only be overcome by 'clear and convincing evidence' of congressional intent to preclude judicial review." *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020) (quoting *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 64 (1993)); *see also Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) (explaining that the presumption may be rebutted by "specific language").

KNRC's reliance on the presumption is therefore precluded: Because § 805 unambiguously applies to KNRC's claim, the presumption is rebutted. But even if § 805 did not apply, the presumption would add little to our analysis because the parties agree judicial review is otherwise available under the APA. *Kucana* is instructive on this point. There, the Court applied the presumption in favor of judicial review only to resolve any "lingering doubt" after determining that the statute in question was susceptible to divergent interpretations. 558 U.S. at 251.[11]

## 5. Other Relevant Precedents

Our interpretation is consistent with a footnote in our decision in *Via Christi*, as well as decisions issued by the Ninth and D.C. Circuits. *See Via Christi*, 509 F.3d at 1271 n.11; *Ctr. for Biological Diversity*, 946 F.3d at 563; *Montanans For Multiple Use v.*

---

[11] The dissent criticizes us for not applying the presumption of judicial review at the beginning of our analysis. No matter; regardless of our paragraph sequence, the ultimate question is whether there is clear and convincing evidence of congressional intent to preclude review.

25

*Barbouletos*, 568 F.3d 225, 229 (D.C. Cir. 2009). And, contrary to KNRC's suggestion, the decisions of other circuits are not to the contrary. In *Liesegang v. Secretary of Veterans Affairs*, 312 F.3d 1368, 1374 (Fed. Cir. 2002), the Federal Circuit interpreted the CRA to determine when a regulation had taken effect without mentioning § 805. *See also Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 202 (2d Cir. 2004) (citing *Liesegang* but also not mentioning § 805). Because neither party in *Liesegang* invoked § 805, the Federal Circuit's opinion does not inform our interpretation of that provision. *See Ctr. for Biological Diversity*, 946 F.3d at 563 n.7 (distinguishing *Liesegang* for that reason).

### III.    CONCLUSION

For the forgoing reasons, KNRC's complaint failed to plausibly allege Article III standing. In the interest of judicial economy, we also interpret 5 U.S.C. § 805 and hold that the district court lacked subject matter jurisdiction over KNRC's claim. The district court's judgment is **AFFIRMED**.

KNCR v. US Department of Interior, No. 19-3108

**LUCERO**, J., dissenting:

This much is undisputed: the Department of the Interior ("DOI") has violated the Congressional Review Act ("CRA"), 5 U.S.C. § 801 et seq., and has indicated no intent to remedy its violation. The Kansas Natural Resource Coalition ("KNRC"), a conservation group, has been harmed by DOI's refusal to comply with the law. Yet the majority's holding closes the courthouse doors to KNRC and any private party seeking judicial relief from an agency's violation of the statute—all under the auspices of enforcing the will of Congress. But Congress enacted the CRA to restore democratic accountability to agency rulemaking. The majority's holding does not give effect to Congress' intent; it undermines it.

With respect to its conclusion that KNRC lacks standing to bring this suit, the majority principally errs by failing to recognize that the harm KNRC alleges is procedural. And with respect to its conclusion that the CRA strips us of jurisdiction to review KNRC's claim, the majority principally errs by failing to properly apply the strong presumption of judicial review of agency action, which places a heavy burden on DOI to show that our review is precluded. For the reasons that follow, I would conclude that KNRC has adequately alleged standing at this early stage of litigation and that DOI has failed to show the CRA clearly and convincingly precludes judicial review of KNRC's claim. I would also conclude that this lawsuit was timely. Accordingly, I would reverse the decision of the district court.

**I**

As the majority recognizes, a plaintiff does not have constitutional standing to sue unless it can establish it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016). I would conclude that KNRC has satisfied all three requirements.

**A**

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Id. at 1548 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). The majority considers only whether KNRC's alleged injury is concrete.

In its complaint, KNRC alleges it has developed a conservation plan (the "Plan") for the lesser prairie chicken in Kansas, where the majority of the species' population is located. It further alleges that listing a species as threatened or endangered under the Endangered Species Act ("ESA") "entail[s] severe regulatory restrictions disruptive to . . . affected states' economies." Thus, listing the prairie chicken would have a substantial impact "on the ability of Kansas and its counties to effectively manage natural resources." Accordingly, KNRC developed the Plan in order to obviate the need for the species to be listed. This is precisely the sort of action envisioned and encouraged by the rule at issue in this case—the Policy for Evaluation of Conservation Efforts When

2

Making Listing Decisions, 68 Fed. Reg. 15,100 (Mar. 28, 2003) (the "PECE Rule" or the "Rule"). Id. at 15,101-04.

The Plan "calls for counties to develop and implement policies" beneficial to the conservation of the lesser prairie chicken. KNRC alleges that to be effective, the Plan requires "positive engagement" on the part of local governments and private landowners. Such engagement includes taking action to "control invasive species," "promote sustainable grazing," "better mark fences to prevent entanglement or injury," and "encourage habitat restoration." KNRC alleges that these actions involve the commitment of "substantial resources."

Two criteria are set forth in the PECE Rule for determining whether a plan like KNRC's—a formalized conservation effort yet to be implemented or to show its effectiveness—obviates the need for a species to be listed. Id. at 15,100. DOI considers "(1) [t]he certainty that the conservation efforts will be implemented and (2) the certainty that the efforts will be effective." Id. at 15,101. "Certainty" is key. KNRC alleges that DOI's failure to submit the PECE Rule to Congress has harmed its ability to demonstrate the "certainty" called for in the Rule. Specifically, it alleges that DOI's failure to submit the PECE Rule to Congress, as required by the CRA, places it in a "catch-22." On the one hand, it must meet the Rule's requirements to protect its interest in avoiding the listing of the prairie chicken. On the other, counties and property owners are less likely to undertake the burdensome actions the Plan requires because the Rule may not actually be in effect, making it more difficult for KNRC to show with "certainty" that the Plan

3

will be implemented and effective. Accordingly, DOI's failure to submit the PECE Rule to Congress has undermined KNRC's ability to protect its interest.

**1**

This asserted injury is concrete. It "is one of process, not result." WildEarth Guardians v. U.S. E.P.A., 759 F.3d 1196, 1205 (10th Cir. 2014). We have recognized that "[f]or a procedural injury, the requirements for Article III standing are somewhat relaxed, or at least conceptually expanded." Id. (citing Lujan, 504 U.S. at 572 n.7). A plaintiff alleging a procedural injury "need not establish with certainty that adherence to the procedures would necessarily change the agency's ultimate decision." Id. (quoting Utah v. Babbitt, 137 F.3d 1193, 1216 n.37 (10th Cir. 1998)). Rather, the plaintiff need only show "that compliance with the procedural requirements could have better protected its concrete interests." Id.

In similar contexts, we have held that procedural injuries comparable to the one alleged by KNRC are concrete for purposes of Article III standing. "We have frequently found standing based on a procedural injury in cases in which environmental groups have alleged that an agency failed to follow the required procedures in taking an action that negatively impacted members' concrete interest in protecting and enjoying the affected land." New Mexico v. Dep't of Interior, 854 F.3d 1207, 1215-16 (10th Cir. 2017) (collecting cases). Specifically, we have recognized that the creation of an increased risk of environmental harm flowing from an agency's failure to follow statutory procedures is a concrete injury. See id. at 1215; Sierra Club v. U.S. Dep't of Energy, 287 F.3d 1256, 1265 (10th Cir. 2002) ("To establish an injury-in-fact from failure to perform a [National

4

Environmental Policy Act ("NEPA")] analysis, a litigant must show: 1) that in making its decision without following the NEPA's procedures, the agency created an increased risk of actual, threatened or imminent environmental harm; and 2) that this increased risk of environmental harm injures its concrete interest." (citing Comm. to Save Rio Hondo v. Lucero, 102 F.3d 445, 449 (10th Cir. 1996))).

We have also recognized outside the environmental-law context that procedural injuries often arise when agencies violate "statutorily mandated procedures . . . designed to protect plaintiffs' interests." New Mexico, 854 F.3d at 1216. In particular, we have held that the loss of an opportunity to sway administrative decisionmakers to rule in favor of plaintiffs is a concrete injury in fact. See Rector v. City & Cnty. of Denver, 348 F.3d 935, 944 (10th Cir. 2003) ("[T]he denial of the opportunity to sway school officials towards [plaintiffs'] cause constituted an injury in fact." (citing Carey v. Piphus, 435 U.S. 247, 261 n.16 (1978))).[1]

KNRC's alleged injury fits comfortably in either characterization of procedural injury. As explained above, KNRC's legally protected interest is its interest in avoiding the listing of the lesser prairie chicken. DOI's refusal to submit the PECE Rule to Congress, in violation of the CRA, has created uncertainty about the validity of the criteria DOI will use in determining whether KNRC's conservation plan obviates the need for the species to be listed. This uncertainty, which impedes KNRC's protection of

---

[1] The majority attempts to distinguish Carey because it is not about the Administrative Procedure Act. (Maj. Op. 16 n.5.) But the majority fails to explain why this distinction makes a difference. It does not: the basis of comparison is the procedural character of the harm alleged in Carey and in this case.

5

its interest, is a concrete injury for standing purposes. See Skull Valley Band of Goshute Indians v. Nielson, 376 F.3d 1223, 1235 (10th Cir. 2004). DOI's failure to comply with the CRA has increased the risk that KNRC will not succeed in protecting its interest, see New Mexico, 854 F.3d at 1215-16; Sierra Club, 287 F.3d at 1265,[2] and has undermined KNRC's opportunity to "sway" the agency to rule in its favor, Rector, 348 F.3d at 944.[3]

Accordingly, I would conclude that KNRC has alleged a concrete injury in this case. The majority disagrees. Much of its error springs from the same root: the majority never identifies KNRC's legally protected interest. As such, its analysis of the concreteness of KNRC's alleged injury is unmoored from the interest allegedly harmed.[4]

---

[2] In conclusory fashion, the majority asserts that "[t]he common theme in these cases is that, in each, the alleged procedural error plausibly threatened an injury far more concrete than some legal uncertainty that might impact a future rulemaking." (Maj. Op. 16 n.5.) It fails to explain this ipse dixit.

[3] The majority asserts that KNRC cannot rely on the PECE Rule "because Congress can overturn [it] at any time, regardless of the CRA." (Maj. Op. 16.) This reasoning is dubious. Under the majority's logic, no litigant could ever rely on a regulation or statute—or even the Constitution—because a law can be repealed at any time and the Constitution is subject to amendment. In any event, KNRC alleges that it is forced to rely on the PECE Rule because DOI treats it as lawfully in effect. We must credit this allegation at this stage of the proceedings. See COPE v. Kan. State Bd. of Educ., 821 F.3d 1215, 1220 (10th Cir. 2016).

[4] The majority suggests KNRC's alleged injury, whatever it is, is not cognizable because "[t]he CRA's requirement that agencies submit their rules to Congress . . . seems designed to facilitate Congress's oversight of the executive branch." (Maj. Op. 15.) Though the majority cites no authority in support of this assertion, it appears to suppose that KNRC's claim falls outside the "zone of interest" of the CRA's reporting requirement. See Hernandez-Avalos v. I.N.S., 50 F.3d 842, 847 (10th Cir. 1995).

There are several problems with this reasoning. First, the zone-of-interest test is applicable in cases involving third-party standing, which is not asserted in this appeal. See id. at 846. Second, the zone-of-interest test "operates as a fairly weak prudential

6

**2**

In the majority's view, KNRC has not alleged a current, tangible harm because it has not specifically alleged that counties or property owners have refused to participate in KNRC's conservation plan; rather, KNRC alleges that its 32 member counties have "adopted" the Plan. (See Maj. Op. 13.) But the majority appears to confuse the adoption of KNRC's Plan with its implementation. The PECE Rule concerns "formalized conservation efforts <u>that have yet to be implemented or to show effectiveness</u>." 68 Fed. Reg. at 15,100 (emphasis added). (See Maj. Op. 6.) The mere fact that KNRC's member counties have adopted the Plan is no guarantee that the Plan is certain to be implemented or effective—the two criteria for evaluating whether the Plan obviates the need for a federal listing. See id. at 15,101. KNRC specifically alleges (1) the Plan calls on participating counties and property owners to take resource-intensive conservation

---

restraint"—it is not a requirement of constitutional standing under Article III. <u>Id.</u>; <u>see also</u> <u>Bennett v. Spear</u>, 520 U.S. 154, 162 (1997). Third, DOI has not argued below or on appeal that KNRC lacks prudential standing in this case. Any such argument is therefore waived. <u>See</u> <u>Wilderness Soc'y v. Kane Cnty.</u>, 632 F.3d 1162, 1168 n.1 (10th Cir. 2011) (en banc) ("[P]rudential standing is not a jurisdictional limitation and may be waived."); <u>Cavic v. Pioneer Astro Indus., Inc.</u>, 825 F.2d 1421, 1425 (10th Cir. 1987) (argument not properly raised below and not advanced on appeal is waived).

    Finally, even if the zone-of-interest test applied, all it requires is "some non-trivial relation between the interests protected by the statute and the interest the plaintiff seeks to vindicate." <u>Hernandez-Avalos</u>, 50 F.3d at 846. In this case, KNRC alleges that the CRA was passed in part to "give[] the public the opportunity to call the attention of politically accountable, elected officials to concerns about new agency rules." <u>See</u> 142 Cong. Rec. S3684 (daily ed. Apr. 18, 1996) (statement of Sens. Nickles, Reid, and Stevens). This allegation satisfies the "weak" zone-of-interest constraint. That the CRA also "seems designed to facilitate Congress's oversight of the executive branch," (Maj. Op. 15), does not displace an additional intent to "give[] the public" a means of raising concerns about agency rules. <u>Id.</u> A statute may serve more than one purpose.

7

actions; (2) these entities rely on the PECE Rule to take the actions called for in the Plan; and (3) DOI's failure to submit the PECE Rule to Congress creates uncertainty about the validity of the Rule, thereby undermining the incentives for taking these burdensome actions. These allegations suffice to plead a tangible injury. The mere fact that KNRC's member counties have "adopted" the Plan does not render KNRC's alleged injury intangible.

The majority also faults KNRC for "fail[ing] to allege that a county or property owner has . . . expressed concerns over the Rule's validity" or raised "doubts about participating in KNRC's conservation plan." (Maj. Op. 13-14.) But such specific allegations are unnecessary for standing purposes at this stage of litigation. "In essence[,] the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." United States v. Colo. Sup. Ct., 87 F.3d 1161, 1164 (10th Cir. 1996) (quotation omitted). In procedural-injury challenges to agency action, the plaintiff needs to allege only that the agency's "compliance with . . . procedural requirements could have better protected its concrete interests." New Mexico, 854 F.3d at 1215 (quotation omitted). Further, "'[g]eneral factual allegations of injury resulting from the defendant's conduct may suffice' to support the claim." COPE, 821 F.3d at 1220-21 (quoting Lujan, 504 U.S. at 561). When "reviewing questions of standing under a motion to dismiss," we must "presume[] general allegations embrace those specific facts necessary to support the claim." Comm. to Save the Rio Hondo, 102 F.3d at 449. Thus, the plaintiff's burden to establish standing at the pleading stage is "lightened considerably." Petrella v. Brownback, 697 F.3d 1285, 1292 (10th Cir. 2012).

8

In other procedural injury cases, we have not required the level of specificity required by the majority. In Southern Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement, 620 F.3d 1227 (10th Cir. 2010), we concluded that the plaintiff organization had alleged a concrete injury where the complaint stated its members used land for various purposes and claimed that proposed mining operations would impair many of these uses. Id. at 1234. We did not require the plaintiff to allege specific "doubts" raised by individual members about their continued ability to use the land, see id., and no such specific allegations appeared in the complaint, see Corrected Second Amended Complaint for Declaratory & Injunctive Relief, S. Utah Wilderness All. v. Off. of Surface Mining Reclamation & Enf't, (D. Utah Nov. 14, 2008) (No. 2:07CV678 DAK). The absence of such specific allegations does not render an asserted injury insufficiently concrete at the pleading stage.

Similarly, in City of Albuquerque v. United States Department of Interior, 379 F.3d 901 (10th Cir. 2004), we addressed an allegation in the City's complaint "that by locating its offices outside the central business area, Interior was weakening the City of Albuquerque and discouraging development and redevelopment of the central business area." Id. at 912 (quotation and alteration omitted). From this allegation, we drew the "natural inference . . . that available property exists within the City of Albuquerque's central business area," such that the defendant's action could injure the City. Id. at 913. We did not require the City to specify how it was weakened or how the defendant's action discouraged development and redevelopment. Instead, "[b]ecause the case [wa]s before us with only a complaint," we concluded that "we must presume that the

9

allegations in the complaint are correct and the City will be able to prove specific facts to support the claim." Id.

Our inquiry in this case is the same. We need not assess at the pleading stage whether KNRC has proven that implementation of the Plan has been hindered by doubts about the validity of the PECE Rule. Instead, we need only satisfy ourselves that KNRC will be able to prove relevant facts if this case proceeds, keeping in mind that KNRC's burden at this stage is "lightened considerably." Petrella, 697 F.3d at 1292. The specific facts sought by the majority are required to establish standing at the summary judgment stage but not at the pleading stage. See Comm. to Save the Rio Hondo, 102 F.3d at 450.

**3**

Apart from its concern about the detail of KNRC's allegations, the majority concludes that the harms KNRC alleges are speculative. (See Maj. Op. 13, 17-18.) The majority characterizes KNRC's injury as contingent on the outcome of future events and asserts, without citation, that "KNRC is not injured by an analysis that has yet to take place." (Id. at 17.) But as I have explained, KNRC's injury "is one of process, not result." WildEarth Guardians, 759 F.3d at 1205.[5] The increased risk that KNRC will be

---

[5] In its reply brief, KNRC discusses provisions in the Administrative Procedure Act requiring agencies to timely act on public petitions to issue new rules. See 5 U.S.C. § 555(b), (e). It does so to illustrate that procedural harms may exist even though it is uncertain whether the agency will ultimately rule in favor of a petitioner on the merits. Citing High Country Citizens Alliance v. Clarke, 454 F.3d 1177 (10th Cir. 2006), the majority concludes that KNRC's "analogy falls short because the right to a response under § 555(e) merely facilitates judicial review when a plaintiff otherwise has Article III standing." (Maj. Op. 14.) It misses the point. KNRC does not claim it is "independently entitle[d] . . . to relief" under § 555(e) "in the absence of prejudice suffered or damage

10

unable to obviate the need for listing the lesser prairie chicken and the diminishment of its opportunity to do so exist independently of whether DOI ultimately decides to list the lesser prairie chicken.[6] That DOI's analysis has yet to take place, and that DOI may ultimately decide not to list the prairie chicken, does not mean KNRC has suffered no harm.

Additionally, the majority rejects KNRC's contention that DOI may "give short shrift" to its conservation plan, stating that the ESA, not the PECE Rule, requires DOI to consider the Plan. (Maj. Op. 17.) The majority misunderstands KNRC's argument. Nowhere does KNRC complain that DOI will not consider the Plan at all. Rather, it argues that it will be procedurally injured if DOI fails to accord the Plan "proper

---

incurred." (Id. (quotation omitted).) Rather, it merely draws the analogy to § 555 to show that the uncertainty of an agency's ultimate determination on the merits of plaintiff's claim does not dispositively mean an asserted procedural injury is speculative. As detailed above, that proposition is well-supported by our precedent. See WildEarth Guardians, 759 F.3d at 1205; New Mexico, 854 F.3d at 1215-16; Rector, 348 F.3d at 944; see also Lujan, 504 U.S. at 572 n.7.

[6] The majority cites Center for Biological Diversity v. Bernhardt, 946 F.3d 553 (9th Cir. 2019), for the proposition that a plaintiff does not have standing when its injury arises from an "analysis," and the "outcome of that analysis is unknown." (Maj. Op. 17.) As an initial matter, KNRC challenges agency action, and this out-of-circuit case does not involve a challenge to agency action. The discussion the majority cites addresses the plaintiff's nondelegation-doctrine challenge to congressional action taken under a separate provision of the CRA not at issue in this case. See Ctr. for Biological Diversity, 946 F.3d at 560. The plaintiff's claim, moreover, was "premised on the assumption" that DOI would take a specific action upon the outcome of purely hypothetical, subsequent litigation. See id. Such speculation is a far cry from KNRC's allegations, which sufficiently establish a concrete procedural injury existing regardless of DOI's ultimate decision whether to list the lesser prairie chicken. Thus, Center for Biological Diversity is not applicable to this case, and even if it were, it would not support the majority's assertion.

11

consideration." The majority observes that "[t]he PECE Rule explains how DOI plans to meet that statutory requirement but does not foreordain any particular outcome." (Maj. Op. 17.) Be that as it may, the PECE Rule contains specific criteria for evaluating whether a conservation plan like KNRC's obviates the need for a federal listing. See 68 Fed. Reg. at 15,101, 15,114-15. KNRC alleges it has relied on these criteria, as it must, in developing a conservation plan sufficient to protect its concrete legal interests. The uncertainty about the validity of these criteria threatens KNRC's ability to protect its interest regardless of the particular outcome. See New Mexico, 854 F.3d at 1215 (in a procedural injury challenge, plaintiff need merely allege that agency "compliance with . . . procedural requirements could have better protected its concrete interests." (quotation omitted)).

For these reasons, I would conclude that KNRC has alleged a concrete procedural injury in this case.

**B**

Although the majority does not address the remaining elements of standing, I briefly address them here. To establish an injury in fact, KNRC's injury must be "particularized." Lujan, 504 U.S. at 560. That is, KNRC must allege it has been injured "in a personal and individual way." Spokeo, 136 S. Ct. at 1548.

KNRC has satisfied this requirement. It alleges it "is an organization of county governments in western Kansas that promotes local government participation in federal and state policy on conservation and natural resource issues." It alleges it developed its conservation plan for the lesser prairie chicken hoping to obviate the need for the species

12

to be listed as threatened under the ESA. And it did so because a federal listing "entail[s] severe regulatory restrictions" that would be "disruptive" to the economies of its 32 member counties and would impair the counties' ability to "effectively manage natural resources." This "personal stake" in the outcome of litigation is sufficient to show particularity. See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 66 & n.5 (1987) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)). KNRC does not allege a "bare procedural violation," Spokeo, 136 S. Ct. at 1550, undifferentiated from the general public's interest "in [the] proper application of the Constitution and laws," Lujan, 504 U.S. at 573, which courts have held to be insufficiently particularized. See also United States v. Richardson, 418 U.S. 166, 177 (1974) (undifferentiated grievance common to all members of the public insufficient to show particularity).

With respect to the second requirement of Article III standing, KNRC must establish that the injury of which it complains is "fairly traceable" to the challenged conduct. Lujan, 504 U.S. at 560 (alteration omitted). It easily satisfies this requirement. KNRC's concrete injury—the undermining of its ability to obviate the need for listing the lesser prairie chicken—results from uncertainty about the validity of the PECE Rule, which itself arises from DOI's failure to submit the Rule to Congress for approval as required by the CRA. DOI's refusal to comply with the statute has thus caused KNRC's injury. See id. ("[T]here must be a causal connection between the injury and the conduct complained of.").

Finally, the injury to KNRC wrought by DOI's noncompliance with the CRA is redressable by this court. See Lujan, 540 U.S. at 561. Crucially, KNRC need not show

that DOI's compliance with the statute would affect its ultimate determination whether to list the lesser prairie chicken. See id. at 572 n.7; Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs., 489 F.3d 1267, 1278 (D.C. Cir. 2007) (with respect to redressability, "in a procedural-injury case, a plaintiff need not show that better procedures would have led to a different substantive result"). Rather, it is enough that were the court to declare the PECE Rule invalid and direct DOI to submit it to Congress, it would eliminate the uncertainty regarding the validity of the Rule and trigger the statutory timeline for the Rule's approval. Armed with the knowledge that the Rule is invalid, KNRC could proceed to take necessary action to implement the Plan with certainty. Cf. Skull Valley Band of Goshute Indians, 376 F.3d at 1234 (observing that invalidating a challenged ordinance allowed a company to "continue with the state agency's permitting process, knowing that obtaining a state agency permit will not have been in vain" (alterations omitted)). Accordingly, KNRC's injury is redressable by the declaratory relief it seeks.

In sum, I would conclude that KNRC has standing to challenge DOI's failure to submit the PECE Rule to Congress in violation of the CRA.

## II

Turning to subject matter jurisdiction, I would hold that § 805 of the CRA does not strip us of judicial power to review DOI's noncompliance with the statute.

## A

"Congress rarely intends to prevent courts from enforcing its directives to federal agencies." Mach Mining, LLC v. E.E.O.C., 575 U.S. 480, 486 (2015); see also Bowen v.

14

Mich. Acad. of Fam. Physicians, 476 U.S. 667, 671 (1986) ("The statutes of Congress are not merely advisory when they relate to administrative agencies, any more than in other cases." (quotation omitted)). We need not doubt an agency's fidelity to law to know that "legal lapses and violations occur, and especially so when they have no consequence." Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv., 139 S. Ct. 361, 370 (2018) (quotation omitted). For this reason, courts have "long applied a strong presumption favoring judicial review of administrative action." Id. (quotation omitted). This presumption applies to statutory provisions purporting to limit or preclude our jurisdiction. See Guerrero-Lasprilla v. Barr, 140 S. Ct. 1062, 1068 (2020); Cuozzo Speed Techs., LLC v. Lee, 136 S. Ct. 2131, 2140 (2016); Kucana v. Holder, 558 U.S. 233, 251 (2010). And it "dictates that such provisions must be read narrowly." El Paso Nat. Gas Co. v. United States, 632 F.3d 1272, 1276 (D.C. Cir. 2011); United States v. Dohou, 948 F.3d 621, 626 (3d Cir. 2020) ("The presumption of Article III review favors construing jurisdiction-stripping provisions narrowly.").

It is the agency's "heavy burden . . . to show that Congress prohibited all judicial review of the agency's compliance with a legislative mandate." Mach Mining, 575 U.S. at 486 (quotations and alteration omitted). The presumption of judicial review of agency action "may be rebutted only if the relevant statute precludes review . . . or if the action is committed to agency discretion by law." Weyerhaeuser, 139 S. Ct. at 370 (emphasis added) (quotation omitted) (citing 5 U.S.C. §§ 701(a)(1), (2)). To satisfy its burden, the agency must provide "clear and convincing indications, drawn from specific language, specific legislative history, and inferences of intent drawn from the statutory scheme as a

whole, that Congress intended to bar review." Cuozzo, 136 S. Ct. at 2140 (quotations omitted). In other words, unless the agency can show by clear and convincing evidence that "Congress wanted an agency to police its own conduct," the presumption of judicial review is not rebutted. Mach Mining, 575 U.S. at 486.[7]

KNRC brings its claim under the Administrative Procedure Act ("APA"). It alleges that DOI's failure to submit the PECE Rule to Congress is "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706. As the majority acknowledges, there is no dispute that the APA confers subject matter jurisdiction over KNRC's claim. (Maj. Op. 19.) Accordingly, our jurisdictional inquiry narrows to whether the CRA strips us of authority to consider the claim. The presumption of judicial review of agency action applies to this inquiry. See Cuozzo, 136 S. Ct. at 2140.

As an initial matter, DOI contends that the presumption of reviewability is an extra-textual canon of statutory interpretation we may not appropriately consider. It argues that no canon can be considered unless the text of a statute is "reasonably susceptible of divergent interpretation." Kucana, 558 U.S. at 251 (quotation omitted). According to DOI, because the text of the CRA's jurisdiction-stripping provision is unambiguous, the presumption that we review agency action is inapplicable.

But DOI conflates whether the presumption is applicable with whether it is rebutted. As explained, the presumption applies when a statute purports to limit or

_____

[7] Though the majority acknowledges this is the correct standard in the final footnote of its opinion, it does not appear to have applied it in its analysis. (Maj. Op. 25 n.11.) And it leaves out the crucial recognition that it is DOI's burden to meet this standard, not KNRC's.

16

preclude judicial review.  See Cuozzo, 136 S. Ct. at 2140.  And it "is just that—a presumption."  Block v. Cmty. Nutrition Inst., 467 U.S. 340, 349 (1984).  It applies at the outset of our jurisdictional inquiry and forms the backdrop against which we consider the statutory text.  See Make the Rd. N.Y. v. Wolf, 962 F.3d 612, 623-24 (D.C. Cir. 2020) (collecting cases).  Against this backdrop, we consider whether it is overcome by the statutory text, legislative history, or inferences of congressional intent drawn from the broader statutory scheme.  Block, 467 U.S. at 349; Cuozzo, 136 S. Ct. at 2140.  In other words, though unambiguous statutory language factors into whether the presumption has been rebutted, it is not a predicate condition for applying the presumption.

Kucana—the case on which DOI relies—is not to the contrary.  See Make the Rd.,962 F.3d at 623-24.  In that case, the Court interpreted the scope of "the proscription of judicial review stated in [8 U.S.C.] § 1252(a)(2)(B)."  558 U.S. at 236.  Considering several sources of information, including the statute's text and the presumption of judicial review, it concluded that § 1252(a)(2)(B) did not strip courts of jurisdiction to review agency action deemed "discretionary" by the Attorney General but not by the statute.  Id. at 253.  With respect to the presumption of judicial review, the Court stated:

> Any lingering doubt about the proper interpretation of 8 U.S.C. § 1252(a)(2)(B)(ii) would be dispelled by a familiar principle of statutory construction:  the presumption favoring judicial review of administrative action.  When a statute is "reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review."

Id. at 251 (quoting Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 434 (1995)).

17

Lamagno, in turn, applied the presumption of judicial review before analyzing whether the text of a jurisdiction-stripping provision was ambiguous. 515 U.S. at 430 ("We return now, in more detail, to the statutory language to determine whether it overcomes the presumption favoring judicial review."). Only after applying the presumption of judicial review did the Court conclude that the statutory text admitted of multiple plausible interpretations. Id. at 434. Faced with these competing interpretations, the Court "adopt[ed] the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review and that mechanical judgments are not the kind federal courts are set up to render."[8] Id.

Lamagno thus clarifies DOI's misinterpretation of Kucana. Nowhere in either case did the Court impose a strict text-before-presumption order of operations. Rather, the Court in Lamagno first determined that the presumption of judicial review applied, then determined that the best interpretation of ambiguous statutory text was the one aligning with courts' historic practice of reviewing agency action. 515 U.S. at 430; see also Bowen, 476 U.S. at 672-73. The Kucana Court similarly cited Lamagno to support its conclusion that under the presumption, the "proper interpretation" of § 1252(a)(2)(B) was the interpretation leaving undisturbed "the unbroken line of decisions upholding court review of administrative denials of motions to reopen." 558 U.S. at 251; see also

_____

[8] Similarly, the Court's application of the presumption in Block, Bowen, Cuozzo, and Mach Mining did not turn on whether the text of the statutory provisions at issue were ambiguous. Rather, the ambiguity or clarity of specific statutory text was germane to whether the presumption was rebutted. See Block, 467 U.S. at 349; Bowen, 476 U.S. at 670-74; Cuozzo, 136 S. Ct. at 2140-41; Mach Mining, 575 U.S. at 486.

18

Guerrero-Lasprilla, 140 S. Ct. at 1069-70 (applying the presumption, then adopting a less restrictive interpretation of the text according with statutory context and legislative history). Thus, contrary to DOI's assertion, Kucana does not make ambiguous statutory text a precedent condition to the application of the longstanding presumption that courts review agency action.[9]

Accordingly, the presumption of judicial review of agency action applies to our determination as to whether § 805 of the CRA strips us of jurisdiction to address KNRC's claim.

**B**

Throughout its analysis, the majority fails to apply this presumption. Not once does it acknowledge the government's "heavy burden" to show that Congress intended to "prevent courts from enforcing its directive[]" that agencies submit proposed rules for approval. Mach Mining, 575 U.S. at 486. Instead of citing Block, Cuozzo, Mach Mining, or any similar case dealing with a statute purporting to strip federal courts of jurisdiction to consider claims arising under the APA, the majority cites In re Taylor, 899 F.3d 1126 (10th Cir. 2018), a bankruptcy case involving neither agency action nor a jurisdiction-stripping provision. That case's general recognition that we begin statutory

---

[9] The majority appears to make a similar mistake. It states that in Kucana, "the Court applied the presumption in favor of judicial review only to resolve any 'lingering doubt' after determining that the statute in question was susceptible to divergent interpretations." (Maj. Op. at 25 (quoting 558 U.S. at 251) (emphasis added).) The word "only" is the majority's invention—it does not appear in Kucana. As explained, the part of Kucana quoted by the majority relies on Lamagno, and Lamagno applies the presumption of judicial review of agency action before determining that the statutory text is ambiguous. It does not apply it only to resolve "lingering doubts."

interpretation with the statute's plain language, id. at 1129, does not displace the foundational presumption that Article III courts review agency action, even if the plain text of a statute purports to strip us of jurisdiction, see Cuozzo, 136 S. Ct. at 2140; Guerrero-Lasprilla, 140 S. Ct. at 1068; see also Make the Rd., 962 F.3d at 624 (presumption of judicial review and tenet that courts begin with statutory text apply in tandem).

Block is the better guide for interpreting a jurisdiction-stripping provision. 467 U.S. at 346; see also Cuozzo, 136 S. Ct at 2140 (applying the Block standard); Mach Mining, 575 U.S. at 486 (same); Kan. ex rel. Schmidt v. Zinke, 861 F.3d 1024, 1028-29 (10th Cir. 2017) (same). Under Block, "[w]hether and to what extent [the CRA] precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." 467 U.S. at 345.[10] When considering this evidence, we must be mindful that it is DOI's "heavy burden" to show that Congress

---

[10] Block suggests that in the context of interpreting jurisdiction-stripping statutes, courts may not consider only the statutory text in determining whether jurisdiction is preserved. See id. (Whether a statute precludes review "is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." (emphasis added)). This instruction aligns with the Supreme Court's repeated recognition that the presumption of judicial review applies even if a statute facially purports to strip or limit review. See Make the Rd., 962 F.3d at 624 ("T[he] 'well-settled' and 'strong presumption' in favor of judicial review is so embedded in the law that it applies even when determining the scope of statutory provisions specifically designed to limit judicial review." (citing Guerrero-Lasprilla, 140 S. Ct. at 1068; Kucana, 558 U.S. at 251-52)).

clearly and convincingly intended for it to police its own compliance with the CRA.

Mach Mining, 575 U.S. at 486 (quotation omitted).

**1**

The CRA provides, "No determination, finding, action, or omission under this chapter shall be subject to judicial review." § 805. KNRC urges a narrow interpretation of this provision, one that does not preclude judicial review of an agency's failure to comply with the CRA's rule-submission requirement. The majority adopts a different interpretation. Relying on dictionary definitions of the words "under" and "omission," the majority concludes that § 805 encompasses any "failure," by any actor mentioned in the CRA, "to do something that the CRA requires." (Maj. Op. 19-21.) According to the majority, because DOI's refusal to submit the PECE Rule to Congress is a failure to follow the CRA's mandatory language, we are stripped of jurisdiction to review KNRC's claim.[11] (Id.)

I cannot accept the majority's broad interpretation. Section 805 precludes review of a "determination, finding, action, or omission under this chapter," but agencies like DOI do not make "findings" or "determinations" under the CRA. We frequently "'rely on the principle[] of noscitur a sociis—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its

---

[11] The majority asserts that KNRC has failed to "resist" this conclusion. (Maj. Op. at 20-21.) It gets the burden backwards. It is DOI's heavy burden to show that Congress clearly and convincingly intended to bar judicial review. See Mach Mining, 575 U.S. at 486. Thus, it is DOI's burden to show that specific statutory text clearly and convincingly evinces congressional intent that agencies police their own conduct. See Cuozzo, 136 S. Ct. at 2140. It is not KNRC's burden to show the opposite.

21

accompanying words.'"  Straub v. BNSF Ry. Co., 909 F.3d 1280, 1287 n.8 (10th Cir. 2018) (quoting Yates v. United States, 574 U.S. 528, 543 (2015) (quotation omitted)). Applying that principle, we have deemed it "anomalous" to interpret words in the same list to cover varying sets of actors.  See Potts v. Ctr. for Excellence in Higher Educ., Inc., 908 F.3d 610, 614 (10th Cir. 2018) (affirming district court's use of noscitur a sociis to reject interpretation that two of six listed acts covered former employees whereas the rest did not).  Instead, we have recognized that when several words "are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar."  Id. (quotation omitted).  We favor interpretations ascribing to all items in a list the attribute they share.  See Smith v. Midland Brake, Inc., 180 F.3d 1154, 1164 (10th Cir. 1999) (quoting Beecham v. United States, 511 U.S. 368, 371 (1994)).

In light of this familiar principle, another plausible reading of § 805 emerges.  The majority defines the word "under" to mean "subject to the authority, control, guidance, or instruction of"—in this case—the CRA.  (Maj. Op. 19.)  All four terms in § 805 describe actions taken after the CRA's review provisions have been triggered.  Congress, for instance, does not make a "finding" or "determination" under the CRA until a rule has been submitted for approval.  Thus, the phrase "under this statute" may reasonably be interpreted to concern "determination[s], finding[s], action[s], or omission[s]" controlled or guided by the CRA after the statute's review provisions have been triggered.  The only action contemplated by the CRA that precedes the operation of its review mechanisms is an agency's submission of a proposed rule.  But the requirement that an agency submit a

22

rule for approval is contained in a provision of the statute titled, "Congressional review," which instructs how a submitted rule must be reviewed upon submission. See § 801. Thus, a plausible—and narrower—interpretation of the statute is that it strips review of compliance with the CRA's review procedures, which do not arise until after an agency has submitted a proposed rule for review. Because this interpretation better accords with "'traditional understandings and basic principles'"—namely, that agency action is subject to judicial review—it is the better interpretation. Guerrero-Lasprilla, 140 S. Ct. at 1069 (quoting Kucana, 558 U.S. at 251)); see also Make the Rd., 962 F.3d at 624 (jurisdiction-stripping provisions "must be read narrowly" (quotation omitted)); Dohou, 948 at 626 (favoring narrower of possible interpretations of jurisdiction-stripping provision).

Further, when placed in context, the ambiguity of the text of § 805 is cast in even sharper relief. See King v. Burwell, 135 S. Ct. 2480, 2489 (2015) ("[W]hen deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme. Our duty, after all, is to construe statutes, not isolated provisions." (quotations and citation omitted)); see also id. ("[O]ftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." (quotation omitted)). Though the majority's interpretation is certainly a possible reading of the plain text, it has a significant flaw:  it renders the CRA ineffectual. See Bowen, 476 U.S. at 671 ("The statutes of Congress are not merely advisory when they relate to administrative agencies, any more than in other cases." (quotation omitted)). For example, the CRA prohibits agencies from adopting rules "substantially similar" to rules submitted to and disapproved by Congress.  § 801(b).  The

statute contains no mechanism by which Congress can enforce this anti-circumvention provision. Several commentators have observed that in the absence of judicial review, an agency could avoid the statute simply by refusing to submit rules for approval, or it could re-issue a rule expressly disapproved by Congress and enforce it against private parties without consequence.[12] See, e.g., Michael J. Cole, Interpreting the Congressional Review Act: Why the Courts Should Assert Judicial Review, Narrowly Construe "Substantially the Same," and Decline to Defer to Agencies Under Chevron, 70 Admin L. Rev. 53, 68 (2018); Paul J. Larkin, Jr., Reawakening the Congressional Review Act, 41 Harv. J.L. & Pub. Pol'y 187, 227, 230 (2018). Interpreting § 805 to preclude review of an agency's failure to submit a rule for approval thus raises separation-of-powers concerns because it "place[s] in executive hands authority to remove cases from the Judiciary's domain." Kucana, 558 U.S. at 237.

Congress has addressed this problem before. When it enacted the Regulatory Flexibility Act ("RFA")—another statute designed to increase agency accountability—

---

[12] Dismissing this concern, the majority characterizes it as pertinent to the surplusage canon and concludes that because the text of § 805 is unambiguous, it need not rely on any canon of statutory interpretation to ascertain the section's meaning. (See Maj. Op. 22 (citing Levorsen v. Octapharma Plasma, Inc., 828 F.3d 1227, 1232 (10th Cir. 2016)).) But whether the majority's interpretation of § 805 renders another provision of the CRA toothless is pertinent to the plain meaning of § 805 because it relates to the overall statutory scheme. See King, 135 S. Ct. at 2489. And in any event, the majority's restrictive approach is inappropriate when dealing with a jurisdiction-stripping provision. As I have explained, "[w]hether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." Block, 474 U.S. at 345 (emphasis added); see also Cuozzo, 136 S. Ct. at 2140. Levorsen, the case on which the majority relies, does not involve a jurisdiction-stripping provision.

Congress expressly precluded judicial review of agency action. See RFA, Pub. L. No. 96-354, § 3(a), 94 Stat. 1164, 1169-70 (1980) (amended 1996) (excluding from judicial review (1) "any determination by an agency concerning the applicability of any provision of this chapter to any action of the agency" and (2) "the compliance or noncompliance of the agency with the provisions of this chapter"). But in 1996, in the same omnibus legislation enacting the CRA, Congress revoked the RFA's preclusion of judicial review because it led agencies to ignore the RFA's requirements. See Contract with America Advancement Act of 1996, Pub. L. 104-121, tit. II, § 242, 110 Stat. 847, 865 (1996) (authorizing judicial review of agency action); 142 Cong. Rec. H3016 (daily ed. Mar. 28, 1996) (statement of Rep. Ewing) ("It is because the agencies know their decision to ignore the RFA cannot be challenged that they almost always do ignore the act."); 142 Cong. Rec. H3005 (statement of Rep. McIntosh) ("[J]udicial review . . . will serve as a needed check on agency behavior and help enforce the mandate of the [RFA].")

KNRC argues that it would be incongruous for Congress, in the same piece of legislation, to provide for judicial review of agency action in the RFA and strip courts of such review in the CRA. We presume that Congress legislates in light of the presumption of judicial review. See Kucana, 558 U.S. at 252. We also presume that Congress legislates in light of existing law. See id. ("[A]bsent a clear manifestation of contrary intent, a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction." (quotation omitted)). We therefore must interpret the CRA to be harmonious with the RFA.

25

DOI contends there is no incongruity between the RFA and the CRA because the two statutes use different language and "have different meanings," and the majority adopts this argument. (Maj. Op. 23-24.) But neither DOI nor the majority elaborate what those meanings might be, how they are different, or why those differences are meaningful. Further, DOI asserts that any incongruity between the two statutes does not rise to the level of an irreconcilable "statutory conflict." But DOI fails to explain this assertion. Without application to the CRA or the facts of this case, it offers only the general observation that "[r]espect for Congress as drafter counsels against too easily finding irreconcilable conflicts in its work." Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1624 (2018).

It bears repeating that it is DOI's "heavy burden . . . to show that Congress prohibited all judicial review of the agency's compliance with a legislative mandate." Mach Mining, 575 U.S. at 486 (quotation and alteration omitted). As previously explained, "Congress rarely intends to prevent courts from enforcing its directives to federal agencies." Id. This case does not present such a rare exception. In light of the strong presumption of judicial review, I would conclude that the text of § 805 does not strip us of jurisdiction to review DOI's failure to submit a proposed rule for approval in compliance with the CRA. I have serious doubts that Congress intended to render the CRA "advisory" by removing a key mechanism for enforcement of its mandate: judicial review. Bowen, 476 U.S. at 671. Though we do not lightly assume Congress intends for agencies to police their own conduct, the majority identifies such exceptional intent in the statutory text by interpreting the word "omission" so broadly that it reaches agency action

26

not covered by its neighboring terms. This interpretation is neither the only plausible reading of § 805 nor the best one. As explained, the jurisdiction-stripping provision can reasonably be read to cover activities occurring after the CRA's review provisions have been triggered, but not before.[13] This narrower interpretation better accords with the "historic practice whereby courts review agency action." Id. at 672-73.

At the very least, against this backdrop, the text of § 805 is insufficient to evince a clear and convincing congressional intent to preclude judicial review of an agency's failure to submit a rule in compliance with the statute. If Congress wanted to bar judicial review of an agency's refusal to submit a proposed rule for approval, it could easily have said so expressly.

**2**

For the foregoing reasons, the plain language of § 805 is insufficient to rebut the strong presumption of judicial review. But our inquiry does not end there. We must also consider the legislative history and purpose of the CRA, and the nature of DOI's action, in determining whether § 805 strips us of jurisdiction to consider KNRC's claim. Block, 467 U.S. at 345.

With respect to the legislative history, KNRC relies on a joint statement by the CRA's sponsors that specifically addresses the scope of § 805. See 142 Cong. Rec.

---

[13] The majority does not appear to argue that this interpretation rises to the level of being "unreasonable." Instead, it debates that its interpretation is the better one. (Maj. Op. 21-22.) The majority's discussion only further demonstrates that the text of § 805 is susceptible to several reasonable interpretations and is therefore, at the very least, ambiguous.

27

S3683 (daily ed. Apr. 18, 1996) (statement of Sens. Nickles, Reid, & Stevens). The joint statement specifies that the jurisdiction-stripping provision bars review of "major rule determinations made by the Administrator of the Office of Information and Regulatory Affairs of the Office of Management and Budget" and "whether Congress [has] complied with the congressional review procedures." Id. at S3686. But crucially, it also states, "The limitation on judicial review in no way prohibits a court from determining whether a rule is in effect. For example, the authors expect that a court might recognize that a rule has no legal effect due to the operation of subsection[] 801(a)(1)(A)"—the CRA's rule-submission provision. Id. That is precisely what KNRC asks us to determine in this case: whether the PECE Rule is in effect because DOI has failed to comply with the CRA's rule-submission requirement.[14]

This legislative history is powerful evidence that Congress did not intend § 805 to strip us of jurisdiction to review DOI's failure to submit the PECE Rule for approval. DOI contends that the joint statement is an illegitimate tool of statutory interpretation because it was recorded twenty days after the CRA was passed. But post-enactment statements "may be relevant to the extent it is persuasive." United States v. Woods, 571 U.S. 31, 48 (2013). We do not apply a categorical rule precluding consideration of post-enactment legislative history.

---

[14] The majority concludes the joint statement is not persuasive because it "contradicts the plain language of § 805." (Maj. Op. 24.) But as explained, the text of § 805 is ambiguous. The joint statement only further illustrates this ambiguity.

The majority similarly discounts the weight of the joint statement, reasoning that because it was recorded after the CRA was passed, it is "an extremely hazardous basis for inferring the meaning of a congressional enactment."[15] (Maj. Op. 24 (quoting Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 118 n.13 (1980)).) But the majority ignores the rationale on which its cited footnote is based. The Court in GTE Sylvania stated that post-enactment legislative history "does not bear strong indicia of reliability . . . because as time passes memories fade and a person's perception of his earlier intention may change." 447 U.S. at 118 n.13.

This concern is substantially mitigated in this case. The joint statement was recorded a mere twenty days after the CRA was enacted, during the same session. Cf. Jones v. United States, 526 U.S. 227, 238 (1999) (post-enactment statements are "a hazardous basis for inferring the intent of an earlier Congress" (emphasis added) (quotations omitted)). Moreover, as the majority observes, Congress anticipated the particular post-enactment statement in question: it was informed that because there would not likely be a conference report or floor manager's statement prior to the CRA's passage, the bill's co-sponsors intended to insert the equivalent of a floor manager's statement in the congressional record at a later time. See 142 Cong. Rec. H3005; (Maj. Op. 4.) These facts specific to the passage of the CRA undercut the general proposition

_____

[15] The majority also assets that we may "cautiously" turn to legislative history only upon "exhaust[ing] the traditional tools of statutory interpretation." (Maj. Op. 24 (quoting Ausmus v. Perdue, 908 F.3d 1248, 1254 (10th Cir. 2018)).) Again, the majority's restrictive order of operations does not apply in cases involving the interpretation of a jurisdiction-stripping provision. See n.7, supra. Ausmus does not involve such a provision.

that post-enactment statements are "hazardous" tools of interpretation "because as time passes memories fade." GTE Sylvania, 447 U.S. at 118 n.13; Jones, 526 U.S. at 238.

Further, as the majority also observes, the House Judiciary Committee published a report in 2006 stating that the joint statement was "the most authoritative contemporary understanding of the provisions of the [CRA]." Staff of H. Comm. on the Judiciary, Subcomm. on Commercial & Admin. L., 109th Cong., Interim Rep. on the Admin. Law, Process & Procedure Project for the 21st Century 86 n.253 (Comm. Print 2006); (Maj. Op. 5.) Although the hazards of relying on post-enactment legislative history are more pertinent here, the Committee's report expressly notes that the joint statement "arguably merits close consideration by a reviewing court as a contemporaneous, detailed, in-depth statement of purpose and intent by the principal sponsors of the law." Interim Rep., at 86 n.253.

I reiterate that it is DOI's heavy burden to show that our jurisdiction to review KNRC's claim has been stripped. DOI has pointed to no legislative history supporting its interpretation of § 805. Even if the majority were correct that the legislative history in this case is of limited value, it weighs in KNRC's favor.

**3**

Turning to the CRA's purpose, the statute's sponsors explained that it is designed to "reclaim[] for Congress some of its policymaking authority, without at the same time requiring Congress to become a super regulatory agency." 142 Cong. Rec. S3683. Thus, the CRA's rule-submission requirement in particular is meant to "give[] the public the opportunity to call the attention of politically accountable, elected officials to concerns

30

about new agency rules." Id. In doing so, the CRA seeks to restore the "delicate balance between the appropriate roles of the Congress in enacting laws, and the Executive Branch in implementing those laws." Id. at S3683.

The majority contends that the statute's purpose "tells us nothing about whether Congress intended district courts to review agency compliance with the CRA's reporting requirements." (Maj. Op. 23.) But as explained above, Congress specifically contemplated such review. See 142 Cong. Rec. S3686. Further, as the Supreme Court has repeatedly recognized, agencies are especially likely to commit "'legal lapses and violations'" when doing so carries no consequence. Weyerhaeuser, 139 S. Ct. at 370 (quoting Mach Mining, 575 U.S. at 489). This observation appears to have been borne out with respect to the CRA—agencies have failed to submit hundreds of rules for approval, despite the statute's clear mandate. See Phillip A. Wallach & Nicholas W. Zeppos, Brookings Inst. Report, How powerful is the Congressional Review Act? (Apr. 4, 2017); Curtis W. Copeland, Cong. Rsch. Serv., Congressional Review Act: Rules Not Submitted to GAO and Congress (Dec. 29, 2009). Absent judicial review, there is no mechanism by which the CRA can be enforced.[16] Because the impetus for passing the CRA was to restore congressional oversight over agency rulemaking, it seems especially unlikely that Congress intended that the rule-submission requirement—which triggers the

_____

[16] DOI contends that "Congress retains adequate means to induce agencies to comply with the CRA's requirements through its lawmaking, investigatory, and appropriation powers." This sweeping argument is unpersuasive. Were the agency able to meet its heavy burden to rebut the presumption of judicial review merely by pointing to general powers of Congress available in every circumstance, the presumption would be meaningless.

31

CRA's review procedures—be excluded from judicial review. See Cole, at 68; Larkin, at 230.

In sum, it is doubtful that Congress hamstrung its own efforts to restore democratic accountability to agency rulemaking when enacting the CRA. See In re Taylor, 899 F.3d at 1129 ("The goal of statutory interpretation is to ascertain the congressional intent and give effect to the legislative will." (quotation omitted)). Accordingly, the purpose of the CRA further supports interpreting § 805 to stop short of precluding judicial review of agency compliance with the statute's rule-submission requirement.

**4**

Finally, regarding "the nature of the administrative action involved," Block, 474 U.S. at 345, KNRC argues that DOI's failure to submit the PECE Rule for approval is the failure to take the sort of discrete and mandatory action constituting agency action unlawfully denied or unreasonably delayed, see Norton v. S. Utah Wilderness All., 542 U.S. 55, 64 (2004); 5 U.S.C. § 706(1) ("The reviewing court shall compel agency action unlawfully withheld or unreasonably delayed."). DOI does not contest this point, and the majority agrees there is no dispute that DOI's action falls within the scope of the APA. (Maj. Op. 19.) Accordingly, the nature of the administrative action involved also weighs in KNRC's favor.

**C**

In light of the foregoing, I would conclude that DOI has failed to rebut the strong presumption that we have jurisdiction to review its refusal to submit the PECE Rule to

Congress for approval. As stated, whether a statute precludes or limits our jurisdiction "is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." Block, 474 U.S. at 345. The text of § 805 is ambiguous because it admits of at least two plausible interpretations: it could reach agency action occurring before the CRA's review provisions are triggered, or it could reach only those actions taken pursuant to those triggered provisions. Properly viewing the text in the context of the statutory scheme underscores the ambiguity of the text. See King, 135 S. Ct. at 2489. Without judicial review of an agency's failure to submit a rule for approval, the CRA's review provisions are never triggered, and the statute becomes unenforceable. We generally presume that Congress does not leave it to agencies to police their own conduct, Mach Mining, 575 U.S. at 486, and that presumption is particularly apt in this case because the purpose of the CRA is to provide increased congressional oversight of, and restore democratic accountability to, the agency rulemaking process. The CRA's legislative history, moreover, specifically contemplates judicial review of an agency's failure to comply with the statute's rule-submission requirement, and such a failure is unquestionably agency action unlawfully withheld or delayed under the APA.

On the other side of the ledger, DOI largely fails to make an affirmative case that Congress intended to strip courts of jurisdiction to review an agency's failure to submit a rule for approval. It relies almost exclusively on the text of § 805. But as explained, the text is ambiguous. It does not demonstrate clearly and convincingly that Congress intended to prohibit all judicial review of an agency's noncompliance with the statutory

33

mandate.  See Mach Mining, 575 U.S. at 486; Cuozzo, 136 S. Ct. at 2140.  Given that the text of § 805 "is reasonably susceptible to divergent interpretation," the majority should have "adopt[ed] the reading that accords with traditional understandings and basic principles:  that executive determinations generally are subject to judicial review." Guerrero-Lasprilla, 140 S. Ct. at 1069 (quoting Kucana, 558 U.S. at 251).  That means interpreting § 805 to not preclude judicial review of DOI's noncompliance with the CRA's rule-submission requirement.

The majority asserts that its contrary interpretation is consistent with those of the Ninth and D.C. Circuits.  (Maj. Op. 25-26.)  But as explained, the Ninth Circuit in Center for Biological Diversity did not address a challenge to agency action.  946 F.3d at 560. Although the D.C. Circuit did address such a challenge in Montanans For Multiple Use v. Barbouletos, 568 F.3d 225 (D.C. Cir. 2009), the court's analysis in that case is erroneous. It comprises two sentences:

> [Section 805] denies courts the power to void rules on the basis of agency noncompliance with the [CRA].  The language of § 805 is unequivocal and precludes review of th[e] claim. . . .

Id. at 229.  Our sibling circuit failed to apply the strong presumption of judicial review of agency action; cite any case law for its analysis; or consider any of the evidence identified in Block, Mach Mining, Cuozzo, and similar on-point cases.  Further, it

determines that the text of § 805 is "unequivocal," but our inquiry must be whether the text is "unambiguous." These are not the same.[17]

Additionally, the majority asserts that its interpretation of § 805 is consistent with a footnote in <u>Via Christi Regional Medical Center, Inc. v. Leavitt</u>, 509 F.3d 1259 (10th Cir. 2007), <u>abrogated on other grounds by</u> <u>Azar v. Allina Health Services</u>, 139 S. Ct. 1804 (2019). The footnote states that the CRA "specifically precludes judicial review of an agency's compliance with its terms." <u>Id.</u> at 1271 n.11. This statement is, however, dicta.

<u>Via Christi</u> did not involve a CRA claim or purport to address one. Instead, it involved whether the Secretary of Health and Human Services lawfully denied a hospital's request for reimbursement for losses due to the consolidation of several hospitals. <u>Id.</u> at 1261. The hospital plaintiff principally argued that the Secretary's decision was inconsistent with the text of a Health and Human Services regulation regarding Medicare, and we agreed. <u>Id.</u> at 1272-73. It was only in its opening brief that the hospital argued in the alternative that a 2000 "program memorandum" was a "rule" covered by the CRA but not submitted to Congress. <u>See</u> Appellant's Opening Brief, <u>Via Christi</u>, 509 F.3d 1259. "Questions which merely lurk in the record are not resolved, and no resolution of them may be inferred." <u>Ill. State Bd. of Elections v. Socialist Workers Party</u>, 440 U.S. 173, 183 (1979) (quotation omitted).

---

[17] The familiar example of "no vehicles in the park"—an unequivocal but nevertheless ambiguous mandate—illustrates this point. <u>See</u> <u>Nat'l Fed'n of Indep. Bus. v. Sebelius</u>, 567 U.S. 519, 562 (2012); H.L.A. Hart, <u>Positivism and the Separation of Law and Morals,</u> 71 Harv. L. Rev. 593, 607 (1958).

Further, a statement is dicta and not binding on a future court if it is "unnecessary to the outcome of the earlier case and therefore perhaps not as fully considered as it would have been if it were essential to the outcome." Exby-Stolley v. Bd. of Cty. Comm'rs, Weld Cty., Colo., 906 F.3d 900, 912 (10th Cir. 2018), reh'g en banc granted sub nom. Exby-Stolley v. Bd. of Cty. Comm'rs, 910 F.3d 1129 (10th Cir. 2018) (quotation omitted). The Via Christi court's statement regarding the CRA was unnecessary to the outcome of the case. Further, as explained above, full consideration of whether § 805 strips us of jurisdiction to review an agency's refusal to submit a proposed rule to Congress entails applying the strong presumption of review and considering the statutory scheme, objectives, legislative history, and the nature of the administrative action involved. Block, 474 U.S. at 345. That the Via Christi court considered none of these things suggests it did not analyze the CRA issue as fully as it would have if it were essential to the outcome of the case. Accordingly, I would conclude that its statement was dicta. See Exby-Stolley, 906 F.3d at 912.

## III

One issue remains: DOI argues that the statute of limitations has expired. Under 28 U.S.C. § 2401(a), "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." Id. A right of action first accrues under § 2401(a) "when all events have occurred which fix the liability of the Government and entitle the claimant to institute an action." Ute Distrib. Corp. v. Sec'y of Interior of U.S., 584 F.3d 1275, 1282 (10th Cir. 2009) (quotation omitted). DOI argues that KNRC's action first accrued in 2003, when the

36

PECE Rule was adopted. KNRC counters that its action first accrued in 2014, when DOI announced the listing of the lesser prairie chicken. Neither party is correct.

As explained in Part I, supra, KNRC's alleged injury in this case is the undermining of its ability to obviate the need for listing the lesser prairie chicken as threatened. KNRC alleges the uncertain validity of the PECE Rule weakens its ability to secure the "positive engagement" of local governments and private landowners necessary for its conservation plan to satisfy the Rule's two criteria. Thus, contrary to DOI's suggestion, KNRC's claim did not accrue when it received notice that the PECE Rule was promulgated because KNRC was not yet injured at that time. See Carnes v. United States, 186 F.2d 648, 650 (10th Cir. 1951) (claim accrues when party suffers injury); see also Impact Energy Res., LLC v. Salazar, 693 F.3d 1239, 1245-46 (10th Cir. 2012) ("[T]he limitations provision in 28 U.S.C. § 2401, not the APA's notice provision, determines the limitations start date in the usual APA case.").

Rather, KNRC's claim first accrued on December 11, 2012, when DOI proposed listing the lesser prairie chicken as a threatened species under the ESA. See Listing the Lesser Prairie-Chicken as a Threatened Species, 77 Fed. Reg. 73,828 (Dec. 11, 2012); (Maj. Op. 7.) KNRC acknowledges that this 2012 proposal spurred its decision to develop the Plan. Its asserted injuries would have arisen no earlier than that time. Because the limitations period for KNRC to bring its claim runs for six years from accrual, KNRC had until December 11, 2018, to bring this lawsuit. KNRC filed its complaint on April 10, 2018. Accordingly, its suit was timely.

**IV**

For the foregoing reasons, I would hold that KNRC has standing to challenge DOI's failure to submit the PECE Rule to Congress; that the CRA does not strip this court of jurisdiction to review KNRC's claim; and that KNRC timely brought suit. Accordingly, I would reverse the judgment of the district court and remand this case for further proceedings. I respectfully dissent.